1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  MAGUIRE PARTNERS – MASTER     )   Case No. **CV 06-07371-JFW(RZx)**
    INVESTMENTS, LLC, MAGUIRE     )
12  PARTNERS, INC., TAX MATTERS   )   Related Case Nos.:
    PARTNERS, et al.,             )
13                                )   CV 06-7374-JFW (RZx)
                                  )   CV 06-7376-JFW (RZx)
14             Plaintiffs,        )   CV 06-7377-JFW (RZx)√
                                  )   CV 06-7380-JFW (RZx)
15        v.                      )
                                  )
16  UNITED STATES OF AMERICA,     )   **AMENDED FINDINGS OF FACT AND**
                                  )   **CONCLUSIONS OF LAW**
17             Defendant.         )
    _____ )

18

19

20       This action came on for a court trial on August 12, 13,

21  and 14, 2008.  Steven R. Mather and Lydia Turanchik of Kajan

22  Mather and Barish appeared for Plaintiffs Maguire Partners –

23  Master Investments LLC, Maguire Partners Inc., Thomas Master

24  Investments LP, Thomas Partners Inc., Tax Matters Partner,

25  Huntington/Fox Investments LP, Edward D. Fox, Jr., Thomas

26  Division Partnership LP, Thomas Investment Partners Ltd.,

27  (collectively "Plaintiffs").  Andrew Pribe, Rick Watson, and

28  Jonathan Sloat of the Office of the United States Attorney

1    appeared for Defendant United States of America

2    ("Defendant").  On September 22, 2008, the parties filed

3    their proposed Post-Trial Findings of Fact and Conclusions of

4    Law.  On October 6, 2008, the parties each filed their Post-

5    Trial Briefs and their marked copies of the opposing parties'

6    proposed Post-Trial Findings of Fact and Conclusions of Law.

7    After considering the evidence, briefs and argument of

8    counsel, the Court makes the following findings of fact and

9    conclusions of law:[1]

10   _____

11       [1]  The Court deferred ruling on the admissibility of
     deposition testimony of Messrs. Mandel, Varellas and Nelson
12   offered by the government as well as certain trial exhibits
     objected to by the parties in the Final Pre-Trial Exhibit
13   Stipulation filed August 5, 2008, pending further post-trial
     submissions by the parties.  On October 6, 2008, the parties
14   filed Notices of Designated Deposition Testimony of Kenneth
     Mandel, Lawrence Varellas, and Kurt Nelson, Plaintiffs'
15   Objections and Defendant's Response to Objections.

16       The Court has reviewed the objections to the proffered
     deposition testimony and the objections to certain trial
17   exhibits in the Final Pre-Trial Stipulation filed August 5,
     2008, and rules as follows:  The Court overrules the
18   objections to Exhibits 45, 52, 53, 54, 74, 81, 82, 85, 86,
     88, 89, 90, 94, 95, 97, 100, 101, 102, 103, 105, 130, 131,
19   140, 141, 142, 143, 144, 145, 146, 151, 260 (a) - (v) and
     those exhibits will be received into evidence as of the last
20   day of trial, which was August 14, 2008.  As to the
     objections to the deposition testimony of Mr. Mandel, all of
21   the Plaintiffs' objections are overruled except for the
     following objections which are sustained:  (1)  p. 35, lines
22   2 - 4.  As to the objections to the deposition testimony of
     Mr. Varellas, all of Plaintiffs' objections are overruled
23   except the following which are sustained: (1) p. 47,  lines
     1- 10 and 15 - 25; (2)  p. 48, lines 1 - 25; (3)  p. 54,
24   lines 1 - 25; (4)  p. 55, lines 1 - 8; and (5)  p. 87, lines
     15 - 25.  As to the objections to the deposition testimony of
25   Mr. Nelson, all of Plaintiffs' objections are overruled.
     Plaintiffs' objections to Defendant's attempt to introduce
26   documents through deposition excerpts which were not marked
     by Defendant as trial exhibits are sustained.   Those
27   documents are inadmissible and will not be received into

28                                           (continued...)

**Findings of Fact**[2]

I.  **Factual and Procedural Background**

   A.  **The Principals and Their Entities**

      1.  **James Thomas**

   James Thomas, a real-estate investor and developer, is the trustee of the Lumbee Clan Trust, which is a partner in Thomas Investment Partners Ltd. ("TIP"), which, in turn, is a partner in Thomas Division Partnership LP ("TDP").  In 2001 through 2002, these various partnerships owned an interest in: the Library Tower in Los Angeles; the Gas Company Tower in Los Angeles; the Wells Fargo Center in Los Angeles; the MGM Plaza in Santa Monica; the Solana project in Dallas; and Commerce Square in Philadelphia.  These investments were highly leveraged with debt in the range of eighty to ninety percent of the value of the property.  Thomas's net worth in 2001 was approximately $200 million, with approximately twenty to thirty percent in cash or marketable securities/cash equivalents and the remainder in real estate holdings, including those identified above.

      2.  **Edward Fox**

   Edward Fox, a real-estate investor and developer, is the trustee of The Edward D. Fox, Jr. Family Trust dated February

---

[1](...continued)
evidence and have not been considered by the Court.

[2]  The Court has elected to issue its findings in narrative form.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

14, 1990 (the "Fox Trust"), which is a partner in

Huntington/Fox Investments LP ("HFI"), which, in turn, is a

partner in both Maguire Partners – Master Investments LLC

("MP-MI") and Thomas Master Investments LP ("TMI").  In 2001

through 2002, these various partnerships owned an interest

in: the Library Tower in Los Angeles; the Gas Company Tower

in Los Angeles; the Wells Fargo Center in Los Angeles; the

MGM Plaza in Santa Monica; the Solana project in Dallas; and

Commerce Square in Philadelphia.  These investments were

highly leveraged with the debt in the range of eighty to

ninety percent of the value of the property.

In 2001, Fox also was a major investor in the

publicly-held Center Trust REIT where he served as chairman

of the board and chief executive officer.  The Media Center

Shopping Mall in Burbank, California was one of the key

assets owned by the Center Trust REIT.  In 2001, Fox also was

a founder and owner of Commonwealth Partners, which was

assembling a portfolio of commercial real estate projects in

partnership with various California state pension funds.

Fox's net worth in 2001 was approximately $50 million.


### B.   The Transactions At Issue

#### 1.   The Lumbee Clan Trust Transaction

On December 20, 2001, the Lumbee Clan Trust and AIG

entered into a transaction in which the Lumbee Clan Trust

paid $1.5 million to AIG.  The source of the funds used to

pay AIG was a distribution from TIP.  Thomas contends that

the purpose of the transaction was to serve as a hedge

against potential loss in the value of his real-estate interests arising from the risk of terrorism after September 11, 2001.   Thomas also contends that the Lumbee Clan Trust paid $1.5 million for an opportunity to receive a net maximum of $38.4 million.   The potential payout from the transaction was tied to the value of a portfolio of twenty REIT stocks (the "REIT basket").

### a.   The Structure of the Transaction

In general, the transaction between the Lumbee Clan Trust and AIG consisted of a short option, a long option, and a promissory note.   On December 20, 2001, the Lumbee Clan Trust and AIG in order to implement the transaction did the following: (1) the Lumbee Clan Trust sold a short option to AIG for $100 million; (2) the Lumbee Clan Trust purchased a long option from AIG for $61,683,169; (3) the Lumbee Clan Trust purchased a promissory note from AIG for $39,816,831; and (4) the Lumbee Clan Trust pledged the proceeds from the long option and the promissory note to secure the short option.   The Lumbee Clan Trust's transaction costs amounted to $1.5 million.   The long and short options were Asian-style European options.[3]   The promissory note eliminated AIG's obligation to transfer funds to the Lumbee Clan Trust in the amount representing the difference between the price of the

---

[3]   An Asian-style option is an option whose payoff depends on the average value of the underlying security or commodity over a specified period of time.   In this case, the Asian-style feature meant that the payout was dependent on the average value of the REIT basket from December 20, 2001, to March 19, 2002, as compared to the value of the REIT basket on December 19, 2001.   A European option is one that can only be exercised on a particular date.   In this case, the date was March 19, 2002.

short option and the price of the long option.  The strike
price of the short option was fifty percent of the value of
the REIT basket, or $100,021,176.  The strike price of the
long option was seventy percent of the value of the REIT
basket, or $140,029,647.

### b.  The Terms of the Transaction

The terms of the transaction provided that any payoff
depended on the average value of the REIT basket between
December 20, 2001, and March 19, 2002, as compared to the
value as of December 19, 2001.  If the average value of the
REIT basket between December 20, 2001, and March 19, 2002,
did not fall by greater than thirty percent as compared to
the value of the REIT basket on December 19, 2001, then the
Lumbee Clan Trust would receive no payout.  If the average
value of the REIT basket between December 20, 2001, and March
19,2002, fell more than thirty percent as compared to the
value of the REIT basket on December 19, 2001, then the
Lumbee Clan Trust would receive a cash payment that would
increase dollar-for-dollar with the reduction in the average
value of the REIT basket below seventy percent of the value
of the REIT basket on December 19, 2001, until a maximum
payout of $40,008,471 was reached.  This maximum payout would
be reached if the average value of the REIT portfolio fell by
fifty percent or more from its value of December 19, 2001.
However, the Lumbee Clan Trust would never be obligated to
pay out-of-pocket anything other than the $1.5 million
transaction costs paid to AIG on December 20, 2001, for the
transaction.

1                     **c.   The Contributions to the Partnerships**

2       On December 27, 2001, the Lumbee Clan Trust contributed

3 the transaction to TIP.  Specifically, the Lumbee Clan Trust

4 contributed the long option and the promissory note, and TIP

5 assumed the short option.  On December 27, 2001, TIP

6 contributed the transaction to TDP.  Specifically, TIP

7 contributed the long option and the promissory note, and TDP

8 assumed the short option.  These contributions of the assets

9 and assumptions of the short option were with the approval of

10 AIG.  After the contributions to the partnerships, AIG's

11 position in the short option remained secured by the pledge

12 of the long option and the promissory note.

13                 **d.   The Performance of the REIT Basket and the**

14                      **Transaction**

15       The value of the REIT basket did not decline by an

16 average of thirty percent for the period between December 20,

17 2001, and March 19, 2002, as compared to its value on

18 December 19, 2001.  Therefore, the transaction did not yield

19 a net payment to TDP.

20                 **e.   The Tax Reporting by the Partnerships and**

21                      **the IRS Adjustments Related to the**

22                      **Transaction**

23                  **(i.)   Thomas Investment Partners**

24       TIP reported on its 2001 Form 1065 that $101,500,000 had

25 been contributed in capital during the year and that this

26 amount constituted an asset of TIP.  TIP also reported on its

27 2001 Form 1065 that the Lumbee Clan Trust had increased its

28 capital in TIP by $101,500,000.  TIP also issued a K-1

(partner's share of income, credits, deductions, etc.) to the Lumbee Clan Trust for 2001 that reflected an increase in the Lumbee Clan Trust's capital account of $101,500,000 due to the contribution of the transaction.  TIP reported on its 2002 Form 1065 that it had interest income of $191,640 and it claimed deductions of $1,691,640.  TIP did not account for the short option on either the Form 1065 or the K-1s for 2001 and 2002.  For 2001, the IRS issued a notice of Final Partnership Adjustment ("FPAA") which adjusted downward the capital contributed to and assets of TIP by $101,500,000 and sought to adjust the outside basis of LCT by $101,500,000. For 2002, the FPAA adjusted downward income by $191,640 and disallowed the deduction of $1,691,640.

(<strong>ii.</strong>)   <strong>Thomas Division Partnership</strong>

TDP reported on its 2001 Form 1065 that $101,500,000 had been contributed in capital during the year and that this amount constituted an asset of TDP.  TDP also reported on its 2001 Form 1065 that TIP had increased its capital in TDP by $101,500,000.  TDP also issued a K-1 to TIP for 2001 that reflected an increase in TIP's capital account of $101,500,000 due to the contribution of the transaction.  TDP reported on its 2002 Form 1065 that it had interest income of $191,640, and it claimed deductions of $1,691,640.  TDP did not account for the short option on either the Form 1065 or the K-1s for 2001 and 2002.  For 2001, the IRS issued an FPAA that adjusted downward the capital contributed to and assets of TDP by $101,500,000, and sought to adjust the outside basis of TIP by $101,500,000.  For 2002, the FPAA adjusted

1  downward income by $191,640, and disallowed the deduction of
2  $1,691,640.

3        **2.   The Fox Trust Transaction**

4      On December 20, 2001, the Fox Trust and AIG entered into
5  a transaction in which the Fox Trust paid $675,000 to AIG.
6  Fox contends that the purpose of the transaction was to serve
7  as a hedge against potential loss in the value of his
8  real-estate interests arising from the risk of terrorism
9  after September 11, 2001.  Fox also contends that the Fox
10 Trust paid $675,000 for an opportunity to receive up to a net
11 maximum of $17,242,574.  The potential payout from the
12 transaction was tied to the value of a portfolio of twenty
13 REIT stocks (the "REIT basket").  This was the identical
14 basket that the Lumbee Clan Trust transaction used.

15       **a.   The Structure of the Transaction**

16     In general, the transaction between the Fox Trust and AIG
17 consisted of a short option, a long option, and a promissory
18 note.  On December 20, 2001, the Fox Trust and AIG in order
19 to implement the transaction did the following: (1) the Fox
20 Trust sold a short option to AIG for $45 million; (2) the Fox
21 Trust purchased a long option from AIG for $27,757,426; (3)
22 the Fox Trust purchased a promissory note from AIG for
23 $17,917,574; and (4) the Fox Trust pledged the proceeds from
24 the long option and the promissory note to secure the short
25 option.  The Fox Trust's transaction costs amounted to
26 $675,000.  The options were Asian-style European options.
27 The promissory note eliminated AIG's obligation to transfer
28 funds to the Fox trust in an amount representing the

1  difference between the price of the short option and the

2  price of the long option.  The strike price of the short

3  option was fifty percent of the value of the REIT basket, or

4  $45,009,529.  The strike price of the long option was seventy

5  percent of the value of the REIT basket, or $63,013,341.

6                **b.  The Terms of the Transaction**

7       The terms of the transaction provided that any payoff

8  depended on the average value of the REIT basket between

9  December 20, 2001, and March 19, 2002, as compared to the

10 value as of December 19, 2001.  If the average value of the

11 REIT basket between December 20, 2001, and March 19, 2002,

12 did not fall by greater than thirty percent as compared to

13 the value of the REIT basket on December 19, 2001, then the

14 Fox Trust would receive no payout.  If the average value of

15 the REIT basket between December 20, 2001, and March 19,

16 2002, fell by more than thirty percent as compared to the

17 value of the REIT basket on December 19, 2001, then the Fox

18 Trust would receive a cash payment that would increase

19 dollar-for-dollar with the reduction in the average value of

20 the REIT basket below seventy percent of the value of the

21 REIT basket on December 19, 2001, until a maximum payout of

22 $18,003,812 was reached.  This maximum payout would be

23 reached if the average value of the REIT portfolio fell by

24 fifty percent or more from its value on December 19, 2001.

25 However, the Fox Trust would never be obligated to pay

26 out-of-pocket anything other than the $675,000 transaction

27 costs paid to AIG on December 20, 2001.

28

### c.   The Contributions to the Partnerships

On December 27, 2001, the Fox Trust contributed the transaction to HFI.  Specifically, the Fox Trust contributed the long option and the promissory note, and HFI assumed the short option.  On December 27, 2001, HFI contributed $34,749,083 of the transaction to MP-MI.  Specifically, HFI contributed seventy-six percent of the long option and the promissory note, and MP-MI assumed seventy-six percent of the short option.  HFI had no prior investment in MP-MI.  On December 27, 2001, HFI contributed $7,682,535 of the transaction to TMI.  Specifically, HFI contributed seventeen percent of the long option and the promissory note, and TMI assumed seventeen percent of the short option.  HFI had no prior investment in TMI.  On December 27, 2001, HFI contributed the remaining seven percent of the transaction to Manhattan Properties, LP[4], which assumed the remaining seven percent of the short option.  These contributions of the assets and assumptions of the short option were with the approval of AIG.  After the contributions to the partnerships, AIG's position in the short option remained secured by the pledge of the long option and the note.

### d.   The Performance of the REIT Basket and the Transaction

The value of the REIT basket did not decline by an average of thirty percent for the period between December 20, 2001, and March 19, 2002, as compared to its value on

---

[4]   The Manhattan Properties, L.P., transaction is not a part of this litigation.

December 19, 2001.  Therefore, the transaction did not yield a net payment to Fox.

### e.  The Tax Reporting by the Partnerships and the IRS Adjustments Related to the Transaction

#### (i.)  Huntington/Fox Investments

HFI reported its investment in MP-MI on its 2001 Form 1065 in the amount of $513,515.  HFI reported its investment in TMI on its 2001 Form 1065 in the amount of $113,519.  HFI reported on its 2002 Form 1065 deductions of $707,183 and income of $80,114 pertaining to the transaction. HFI did not account for the short option on either the Form 1065 or the K-1s for 2001 and 2002.  For 2001, the IRS issued an FPAA that adjusted downward the capital contributed to and assets of HFI by $42,431,618, and sought to adjust outside basis of the Fox Trust by $42,431,618.  For 2002, the FPAA adjusted income downward by $80,114, and disallowed the deduction of $707,183.

#### (ii.)  Maguire Partners-Master Investments

MP-MI reported on its 2001 Form 1065 that it had made a capital contribution of $34,749,083 during the year and that this amount constituted an asset of the partnership.  MP-MI also reported on its 2001 Form 1065 that HFI had increased its capital in MP-MI by $34,749,083.  MP-MI also issued a K-1 to HFI for 2001 that reflected an increase in the HFI's capital account of $34,749,083 due to the contribution of the transaction.  MP-MI reported on its 2002 Form 1065 that it had interest income of $65,609 and it claimed deductions of

1   $579,143 pertaining to the transaction.  It also reported

2   other investments of $34,235,549.  MP-MI did not account for

3   the short option on either the Form 1065 or the K-1s for 2001

4   and 2002.  For 2001, the IRS issued an FPAA that adjusted

5   downward the capital contributed to and assets of MP-MI by

6   $34,749,083 , and sought to adjust the outside basis of HFI

7   by $34,749,083.  For 2002, the FPAA adjusted downward income

8   by $65,609, and disallowed the deduction of $579,143.  The

9   IRS also adjusted the other investments downward by

10  $34,235,549.

11              (**iii.**)  **Thomas Master Investments**

12       TMI reported on its 2001 Form 1065 that it had made a

13  capital contribution of $7,682,535 during the year and that

14  this amount constituted an asset of TMI.  TMI also reported

15  on its 2001 From 1065 that HFI had increased its capital in

16  TMI by $7,682,535.  TMI also issued a K-1 to HFI for 2001

17  that reflected an increase in HFI's capital account of

18  $7,682,535 due to the contribution of the transaction.  TMI

19  reported on its 2002 Form 1065 that it had interest income of

20  $14,505, and it claimed deductions of $128,040 pertaining to

21  the transaction.  It also reported other investments of

22  $7,569,000.  TMI did not account for the short option on

23  either the Form 1065 or the K-1s for 2001 and 2002.  For

24  2001, the IRS issued an FPAA that adjusted downward the

25  capital contributed to and assets of TMI by $7,682,535, and

26  sought to adjust the outside basis of HFI by $7,682,535.  For

27  2002, the FPAA adjusted downward income by $14,505, and

28

1   disallowed the deduction of $128,040.  The IRS also adjusted

2   the other investments downward by $7,569,000.

3

4   **C.   Background Regarding the Transactions at Issue**

5          **1.   The Arthur Andersen Call-Option Spread**

6          The transactions that were entered into by the Lumbee

7   Clan Trust and AIG and the Fox Trust and AIG were designed by

8   Arthur Andersen and referred to internally by various names,

9   such as the "call-option spread", the "synthetic put" and

10  "asset-hedging."  The call-option spread consisted of two

11  call options – one long and one short – and a promissory

12  note.[5]  By using the call-option spread, a taxpayer would be

13  able to create a basis in an amount substantially greater

14  than the amount of money actually paid for the call-option

15  spread by taking the position that the transaction created a

16  "contingent" liability for purposes of I.R.C. § 752.  In

17  order to create basis and obtain the tax benefit, the

18  taxpayer was required to contribute the call-option to a

19  partnership.

20         The call-option spread was viewed by Arthur Andersen tax

21  partners as one of many-tax-avoidance techniques marketed by

22  Arthur Andersen.  In fact, from 1999 to 2001, Arthur Andersen

23  _____

24         [5]   Ken Mandel was a tax partner at Arthur Andersen who
    worked on "leading edge tax solutions for both high-net-worth
    clients and large public corporations."  Defendant contends
25  that Mandel developed the call-option spread, which is an
    allegation that Plaintiffs deny.  In any case, it is clear
26  from the evidence in this case that Mandel is familiar with
    the Arthur Andersen technique referred to as the call-option
27  spread.  In fact, Mandel described the call-option spread as
    suitable "for a handful of very large dollar, trust-client
28  transactions, where we excluded the participation from
    outside attorneys and other non Firm professionals."

arranged approximately ten call-option spread transactions,
and in all but one of these transactions AIG was the counter-
party.  The call-option spread was considered a "proven
solution" by Arthur Andersen, which included techniques
offered by Arthur Andersen to minimize taxes.  It is
estimated that the call-option spread transactions generated
about $14.7 million in fees for Arthur Andersen in fiscal
years 2000 and 2001.

> ## 2. Thomas and Fox Learn About the Call-Option Spread

In 2001, Martin Griffiths, a tax partner in the Los
Angeles office of Arthur Andersen, was the engagement partner
and the main point of contact for Thomas and Fox.  In fact,
Thomas, Fox, and another real estate investor, Robert
Maguire, represented approximately one hundred percent of
Griffiths's business.  Because Griffiths was familiar with
the investment portfolios and tax needs of Thomas and Fox, he
considered it his duty to investigate and determine if any of
the "interesting planning ideas" presented to him by Arthur
Andersen had any applicability to Thomas or Fox.  He
testified that it was his job to bring Arthur Andersen's
"industry expertise" to bear on Thomas and Fox's interests.

Sometime before September 11, 2001, Griffiths became
aware of the call-option spread, and decided to investigate
it for Thomas, Fox, and Maguire.  Before September 11, 2001,
Griffiths contacted his fellow tax partner Mandel to learn
more about the call-option spread.  After discussing the
call-option spread with Mandel, Griffiths and Mandel met with

Thomas and, separately, with Fox on September 27, 2001.
During these meetings, Mandel explained to Thomas, a former
trial attorney with the I.R.S., and Fox the increased basis
that could result from the call-option spread, which Mandel
described as a hedge, if the options and note were
contributed to a partnership.  In the weeks after the
September 27, 2001 meetings, Griffiths continued to discuss
the call-option spread with Thomas and Fox, including
detailed discussions regarding the structure of the
transaction.

     In December 2001, Paul Rutter, outside transactional
counsel to Thomas and Fox, met with Mandel to discuss the
transaction.  He also reviewed the transactional documents
prepared by Sullivan & Cromwell, counsel to AIG.  Rutter was
not an expert on options or hedging, and did not provide
business advice to Thomas or Fox regarding the transaction.
Instead, Rutter's representation was limited to reviewing the
documents prepared by AIG's counsel, which included the
contribution agreements by which the transaction would be
contributed to the partnerships.  Rutter testified that it
was his understanding "that they [AIG] were doing this
transaction with other people and had a pre-existing set of
documents they used[.]"

     Rutter also testified that the decision to contribute the
transactions to Thomas and Fox's respective partnerships had
already been made by the time he became involved in the
transaction.  In fact, Thomas and Fox admitted that it was
always their intention to contribute the transactions to

1  their respective partnerships.  The partnership contributions
2  were always viewed by Thomas, Fox, Griffiths, and Rutter as
3  integral to the entire transaction.

4      On December 20, 2001, Thomas and Fox entered into the
5  call-option spread transactions, described above, with AIG.

6
7  **II.  Discussion**

8      **A.   The Lumbee Clan Trust Transaction And The Fox Trust**
9          **Transaction Lack Economic Substance.**

10     A taxpayer is not permitted to reap tax benefits from a
11  transaction that lacks economic substance.[6]  *Coltec*
12  *Industries, Inc. v. United States*, 454 F.3d 1340, 1352-55
13  (Fed. Cir. 2006) (discussing Supreme Court precedent invoking
14  economic substance since 1935).  As the Federal Circuit
15  explained in *Coltec*, the economic substance doctrine requires
16  "disregarding, for tax purposes, transactions that comply
17  with the literal terms of the tax code but lack economic
18  reality," and, thus, "prevent[s] taxpayers from subverting

19  ─────────────────────
       [6]  Defendant argues that Plaintiffs are not entitled to
20  the increased basis created by the transactions at issue
    under the economic substance doctrine, the substance-over-
21  form doctrine, or the step-transaction doctrine.  As the
    *Stobie Creek* court noted, "[t]hese doctrines vary in origin
22  and somewhat in application, yet apply to the same analysis."
    (citing *King Enters., Inc. v. United States*, 418 F.2d 511,
23  516 n. 6 (1969) ("[C]ourts have enunciated a variety of
    doctrines, such as step transaction, business purpose, and
24  substance over form.  Although the various doctrines overlap
    and it is not always clear in a particular case which one is
25  most appropriate, their common premise is that the
    substantive realities of a transaction determine its tax
26  consequences."); and *H.J. Heinz Co. & Subsidiaries v. United*
    *States*, 76 Fed.Cl. 570, 583-85 (2007) (discussing multiple
27  formulations employed by courts to consider whether
    transaction has economic substance or whether it is a
28  "sham")).

1  the legislative purpose of the tax code by engaging in
2  transactions that are fictitious or lack economic reality
3  simply to reap a tax benefit." *Id.* at 1352-54.

4      **1.   Legal Standard for Economic Substance Analysis**

5      To determine whether a transaction is merely an economic
6  sham, the court must determine whether the transaction had
7  any practical economic effect other than the creation of tax
8  benefits. *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th
9  Cir. 1990); *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th
10 Cir. 1988). Therefore, the court must exam the objective
11 economic substance of the transaction and the subjective
12 business motivation of the taxpayer. *Sochin*, 843 F.2d at
13 354; *Casebeer*, 909 F.2d at 1363. However, the objective and
14 subjective inquiries are not "discrete prongs of a rigid two-
15 step analysis," but "are simply more precise factors to
16 consider in the application of [the Ninth Circuit's]
17 traditional sham analysis; that is, whether the transaction
18 had any practical economic effects other than the creation of
19 income tax losses." *Id.*

20      **a.   The Objective Economic Substance Inquiry**

21      Under the objective economic substance inquiry, the Court
22 must determine "whether the transaction ha[s] economic
23 substance beyond the creation of tax benefits." *Casebeer*,
24 909 F.2d at 1365 (*citing Bail Bonds by Marvin Nelson, Inc. v.*
25 *Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987). To do so,
26 the court must analyze whether the "substance of the
27 transaction reflects its form" and whether, objectively, "the

28

1  transaction was likely to produce economic benefits aside
2  from a tax deduction." *Id.*

3      A transaction lacks objective economic substance where it
4  does not appreciably affect a taxpayer's beneficial interest
5  except to reduce his taxes. *Knetsch v. United States*, 364
6  U.S. 361, 366 (1960); *ACM Partnership v. Commissioner*, 157
7  F.3d 231 248 (3d Cir. 1998).  For example, *de minimis*
8  economic effect – such as the accumulation of small amounts
9  of cash value in an annuity contract or the assumption of
10  marginal risks in a partnership arrangement – are
11  insufficient to create economic substance.  *Knetsch*, 364 U.S.
12  361, 365-66 (finding transaction involving leveraged
13  annuities to be economic sham because possible $1,000 cash
14  value of annuities at maturity was "relative pittance"
15  compared to purported value of annuities); *ASA Investerings*
16  *Partnership v. Commissioner*, 201 F.3d 505, 514 (D.C. Cir.
17  2000); *ACM*, 157 F.3d at 251-52.

18              **b.    The Subjective Business Purpose Inquiry**
19      The Court analyzes a taxpayer's subjective business
20  purpose by determining "whether the taxpayers have shown that
21  they had a business purpose for engaging in the transaction
22  other than tax avoidance." *Casebeer*, 909 F.2d 1363-64.  This
23  analysis "often involves an examination of the subjective
24  factors that motivated a taxpayer to make the transaction at
25  issue," such as the experience of the taxpayer, the extent of
26  the taxpayer's investigation into a transaction, the extent
27  of any advisor's investigation into the deal, and the
28  taxpayer's trial testimony regarding their motivation for

entering into the transaction."  *Bail Bonds*, 820 F.2d at 1549; *see, also, Casebeer*, 909 F.2d at 1364.

One factor that can be considered in analyzing a taxpayer's subjective business purpose is whether the taxpayer was acting like a prudent economic actor or contrary to rational business interests in the transaction.  *See, e.g., Gilman v. Comm'r*, 933 F.2d 143, 146-47 (2d Cir.1991) (requiring taxpayer to demonstrate that prudent investor could have concluded that "realistic potential for economic profit" existed) (internal quotation marks omitted); *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir.1985) (equating lack of economic substance with finding that "no reasonable possibility of a profit exists"); *Long Term Capital*, 330 F.Supp.2d at 172 (finding that transaction lacked economic substance because, "at the time the transaction was entered into, a prudent investor would have concluded that there was no chance to earn a non-tax based profit return in excess of the costs of the transaction"); *Estate of Strober v. Comm'r*, 63 T.C.M. (CCH) 3158, 3160 (1992) ("We conclude that ... a prudent investor, relying upon independently obtained appraisals and research, would not have concluded that [the] transaction offered a reasonable opportunity for economic gain exclusive of tax benefits.").  Thus, as the Federal Circuit found in *Coltec,* there must be an objective inquiry into economic reality that would ask "'whether a reasonable possibility of profit from the transaction existed,'" *Coltec*, 454 F.3d at 1356 (quoting *Black & Decker*, 436 F.3d at 441), and "whether the

transaction has 'realistic financial benefit.'" *Id*. at 1356
n. 16 (quoting *Rothschild*, 407 F.2d at 411); *see, also, Jade
Trading,* 80 Fed. Cl. At 47-48 ("The inquiry is not whether
the [taxpayers] *believed* the Jade transaction was a real
investment capable of making a profit, but whether the Jade
transaction in fact objectively was a real investment capable
of making a profit and altering their financial positions.").
In addition, where a taxpayer is sophisticated in economics
and/or taxation, entering a bad deal may shed light on the
taxpayer's true tax-avoidance motivation.  *Id.* ("the absence
of reasonableness sheds light on Long Term's subjective
motivation, particularly given the high level of
sophistication possessed by Long Term's principals in matters
economic.").  Similarly, a conspicuous lack of concern over
the particulars of the transaction by the taxpayer may be
evidence that the transaction is a sham.  *See, Mahoney v.
Commissioner*, 808 F.2d 1219, 1220 (6th Cir. 1987).

> **2.   The Transactions At Issue Lack Economic
>       Substance**

The presence or lack of economic substance for federal
tax purposes is determined by a fact-specific inquiry on a
case-by-case basis.  *Frank Lyon*, 435 U.S. at 584.  In this
case, the Court finds that the evidence demonstrates that the
transactions at issue do not have economic substance because
Thomas and Fox received no economic benefit, other than the
increase in basis, from the transactions.  In addition, the
Court finds that the evidence demonstrates that Thomas and

Fox were motivated by this increased basis and not by any
purported "hedging" benefit.

Plaintiffs argue that factual differences between this
case and the recent economic substance cases of *Stobie Creek*
and *Jade Trading* mean that the transactions at issue in this
case do, in fact, have economic substance.  However, an
examination of how the economic substance analysis was
applied in *Stobie Creek* and *Jade Trading* demonstrate that the
transaction at issue in this case, like the transactions in
those cases, do not have economic substance.

> **a.   Under the Economic Substance Analysis as
> Applied in *Stobie Creek*, The Transactions
> At Issue in This Case Lack Economic
> Substance**

*Stobie Creek* involved the contribution of offsetting long
and short foreign-currency options to single-member LLCs.
The plaintiffs in *Stobie Creek* alleged that the principal
involved was a "reasonable investor" who "made a reasonable
assessment regarding profitability."  *Id*. at 693.  In
evaluating this claim, the court stated that it could not
"ignore the functional and historical reality that the
[offsetting option pairs] were part of the prepackaged J&G
strategy marketed to shelter taxable gains."  *Id.*  In
addition, the Court in *Stobie Creek* relied heavily on the
expert testimony offered by the Government in concluding that
"plaintiffs' attempts to establish a legitimate profit motive
wither against the devastating, much more credible expert
testimony that established the objective economic reality

that the [offsetting option pairs] were severely over-priced,
had a negative expected-rate-of-return, and consequently had
a scant profit potential." *Stobie Creek*, 823 Fed. Cl. At
696.   The Government's expert concluded that the transaction
"was priced at levels that far exceeded [the components']
theoretical value[,]" where those values were computed using
an adaptation of the Black-Scholes model.   *Id.* At 685.

The court dismissed the plaintiffs' expert's criticism of
the Government's expert's reliance on the Black-Scholes
model.   While the court recognized the validity of the
criticism that "the model involves assumptions of perfect and
static markets[,]" it found that the plaintiffs' expert
"could not offer a more appropriate substitute." *Id.* at 689-
90.   The court concluded that the expert testimony "suggests
that no reasonable and prudent investor would have expected a
possibility of a profit on these transactions." *Id.* at 693.

In evaluating the subjective business purpose prong of
the economic substance analysis, the court rejected the
testimony of the principal that he "believed a 30% chance of
doubling his investment existed" because the court found that
"the [offsetting option pairs] had no objectively reasonable
possibility of returning a profit and therefore lacked an
objective business purpose." *Id.* at 698.   The court found
that the transactions were "integral to a 'preconceived' tax
shelter scheme that was not structured to create a viable
profit-producing investment, but, rather, to inflate the
basis in an unrelated asset that would yield large capital
gains upon sale." *Id.*   Moreover, the court found that while

there was "limited evidence" of an investment motive, the evidence was "not sufficient to overcome the evidence that the [offsetting option pairs] were economic nullities beyond producing the claimed tax benefits." *Id.*

Similarly, in this case, Defendant's expert, Professor Grendier, used recognized option-pricing-modeling techniques to conclude that the value of the Thomas transaction was $574, and the value of the Fox transaction was $259.[7] Therefore, based on a thirty-five percent volatility, Thomas and Fox paid approximately 2,700 and 2,600 times the value of the transactions they purchased.

Although Plaintiffs' experts, Professors Manaster and Edelstein, criticized Professor Grendier's Black-Scholes method, Professor Manaster testified that, in the absence of comparative prices, he would have performed the same analysis while Professor Edelstein offered no acceptable alternative to Professor Grenadier's analysis.

Moreover, like the transaction in *Stobie Creek*, the call option spread was a prepackaged deal offered by Arthur Andersen that focused on the creation of basis.  Arthur Andersen did not offer any advice on whether the transaction was a hedge, and Mandel, who offered the call option spread to Thomas and Fox, had no expertise on hedging or options.

Finally, there is no credible evidence that the transactions performed as hedges.  First, there is no

---

[7]  Professor Grenadier used a thirty-five percent implied volatility, which is validated by the implied volatility of the Bank of America and JP Morgan quotes Plaintiffs received for similar transactions.

credible evidence that a close correlation exists between the value of the broad-based REIT basket and the value of any of Thomas's and Fox's real estate investments.  Second, even if the transactions served as hedges, the price paid by Thomas and Fox vastly exceeded any benefit they could have received. In addition, despite claiming to follow the REIT market closely, Fox did not know the difference between the average drop required to produce a return of one dollar on his transaction, and the historical drop that occurred in 1974. Therefore, as in *Stobie Creek*, the Court does not find that the self-serving testimony of the principals, Thomas and Fox, sufficient to overcome the substantial and objective evidence that the transactions at issue are economic nullities entered into for the purpose of fabricating tax basis in amounts that are vastly disproportionate to the actual cost.

> **b.   Under the Economic Substance Analysis as Applied in *Jade Trading*, The Transactions At Issue in This Case Lack Economic Substance**

*Jade Trading*, another recent case involving economic substance analysis, involved the contribution of a long option and a short option to a partnership.  *Jade Trading*, 80 Fed. Cl. at 11-13.  The three taxpayers each paid $150,002, and each obtained an increased basis of $15 million.  *Id.* The court disallowed the claimed tax benefits and determined that the transaction was an economic sham.  *Id.* at 14.  The court reached its conclusion based on five reasons.  First, the claimed losses "were purely fictional" because the

taxpayers "did not invest $15 million in the spread and did not lose $15 million when exiting Jade without exercising either option."  Second, the plaintiffs contentions that the transaction had a profit potential was contradicted by the large limitation on the maximum net profit that could be earned and the "large and unusual" fees that the plaintiffs paid.  Third, the transaction was "devised and marketed by a tax accounting group . . .as a tax product, not by an investment advisor as a vehicle to earn a profit," and, thus, the court found it "was developed as a tax avoidance mechanism and not an investment strategy."  Fourth, the initiation of the transaction outside the partnership followed by the contribution to the partnership "had no effect whatsoever on the investment's value, quality, or profitability, except to add cost and burden," but "packaging the investment in the partnership vehicle was an absolute necessity for securing the tax benefits."  Fifth, there was a "highly disproportionate tax advantage to the underlying monetary outlay – the tax loss per [taxpayer], $14.9 million, was roughly 65 times greater than each LLC's $225,002 financial commitment to Jade, almost 100 times each LLC's $150,002 investment in the spread transaction which generated the loss, and approximately 100 times the $140,000 potential net profit each LLC could have earned."

     Similarly, the Court finds that consideration of these same five reasons in this case leads to the same result – that the transactions at issue in this case lack economic substance.  First, the claimed basis is fictional, because

Thomas and Fox paid only $1.5 million and $675,000,
respectively for the integrated transactions they purchased,
but gained an increased basis of $101,500,000 and
$45,675,000, respectively.  The increase in basis is
approximately sixty-seven times what they paid for the
transactions.  Second, as Professor Grenadier explained,
there is virtually no likelihood of a thirty percent average
drop over ninety days – the drop required to yield a one
dollar return – much less the average fifty percent drop
required to yield the maximum payout possible.[8]  Third, the
design of the call option spread demonstrates that it was
designed for the creation of tax benefits.  Mandel, who was
intimately familiar with the call option spread transaction
format and was integral in selling these transactions to
Thomas and Fox, was a tax expert specializing in "leading
edge tax solutions," not an options or risk-management
expert.  Moreover, there is no evidence that the call option

---

[8]  In post-trial filings in January 2009, Plaintiffs ask
the Court to take judicial notice of the fact that had
options with identical terms been purchased on October 1,
2008, there would have been a payoff.  In fact, Plaintiffs
allege that the actual drop in the REIT basket for the
ninety-day period from October 1, 2008 to December 29, 2008,
using Asian-style options was 43.47 percent.  Defendant does
not dispute that this information is accurate, but asserts
that it is irrelevant because Defendant did not argue that a
payoff from the transactions as issue was "impossible", but
merely "extremely low" and, thus, any economic substance from
the transactions at issue was *de minimis*.  The Court agrees
with Defendant that the fact that Plaintiffs are able to
demonstrate one instance of an Asian-style European option
drop in the nearly fifty-year history of REITs occurring
seven years after the transactions in question does not
change the Court's conclusion that a payoff from the
transactions at issue was, at best, highly unlikely.  In
addition, the Court's conclusion that the transaction at
issue lack economic substance is based on, as explained
above, a variety of other factors.

spread was designed as a hedge generally, or that it operated
as a hedge with respect to the transactions at issue in this
case.   Fourth, there is no evidence that the contribution to
the partnerships, which was part of the design of the
prepackaged transactions, had any effect "on the investment's
value, quality, or profitability."  However, the contribution
was required for the creation of an increased basis.   In
addition, in the weeks after Mandel first discussed the call
option spread with Thomas and Fox, Griffiths provided tax
advice to them about the increased basis they would achieve
if they purchased the transactions.  Fifth, the tax benefit
is highly disproportional – sixty-seven times – to the actual
economic outlay.   As a result the Court finds that the
transactions at issue lack economic substance.

> c.   **The Transactions At Issue In This Case Are**
> **Economic Shams.**

In this case, it is clear that Plaintiffs are not
taxpayers "who structured their transactions and ordered
their affairs in a way so as to reduce their liability for
taxes or to achieve the greatest tax benefits; rather, the
tax benefits shaped the structure of the investment in order
to achieve the goal of tax avoidance."  *Stobie Creek*, 82 Fed.
Cl. at 698; *see, also, Coltec*, 454 F.3d at 1357 ("there is a
material difference between structuring a real transaction in
a particular way to provide a tax benefit (which is
legitimate), and creating a transaction, without a business
purpose, in order to create a tax benefit (which is
illegitimate).").  Because of the mismatch between the

purported purpose of "hedging" and the inability of the
Asian-style options to satisfy that purpose, the dramatic
overpayment by Thomas and Fox for the *de minimis* value they
received in return, and the virtual impossibility of
receiving even one dollar in return versus the certain
increase in basis by $101,500,000 Thomas and 445,675,000 by
Fox, the Court finds that the only appreciable benefit gained
by the transactions at issue was an increased basis.  This
conclusion is supported by the fact that Thomas and Fox were
sophisticated economic actors.  In fact, Thomas was a former
trial attorney with the IRS.  Thomas and Fox, along with
Griffiths, their tax advisor, obviously recognized the value
that would result from the increased basis, such as shielding
distributions of cash and property from their partnerships by
characterizing that property as a return on capital, or
reducing the obligation to restore a negative capital account
on termination of their partnerships.

     The Court finds that the weight of evidence, including
the persuasive expert testimony by Professor Grenadier,
established that the transactions at issue did not
appreciably improve the economic position of Thomas and Fox
beyond the creation of an increased basis.  Any subjective
belief by Thomas and Fox that the transaction constituted a
hedge was not objectively supported by the evidence, and any
subjective belief that there was an economic benefit is not
objectively reasonable.  No prudent business person, such as
Thomas or Fox, would pay between 2,600 and 2,700 times the
value of the transactions in this case for this type of a

hedge.  Because the transactions do not provide any
appreciable economic benefit to Thomas or Fox, the Court
finds that the transactions at issue are economic shams, and
any evidence of a non-tax avoidance subjective motivation is
not sufficient to give the transactions economic substance.
Therefore, the transactions must be disregarded under the
prevailing economic substance doctrine, and are without
effect for purposes of federal taxation.

**B.**    **Application of the Step Transaction Doctrine Yields**
          **a Cost-Basis of $1.5 Million for Thomas and $675,000**
          **for Fox.**

As an alternative to the economic substance doctrine,
Defendant also seeks to invalidate the tax effects claimed by
Plaintiffs under the step transaction doctrine.  "The Supreme
Court has expressly sanctioned the step transaction doctrine,
noting that 'interrelated yet formally distinct steps in an
integrated transaction may not be considered independently of
the overall transaction.'"  *The Falconwood Corp. v. United
States*, 422 F.3d 1339, 1349 (2005) (quoting *Comm'r v. Clark*,
489 U.S. 726, 738 (1989)).  "[T]he objective of the doctrine
is to 'give tax effect to the substance, as opposed to the
form of a transaction, by ignoring for tax purposes, steps of
an integrated transaction that separately are without
substance.'"  *Id*. (quoting *Dietzsch v. United States*, 204
Ct.Cl. 535, 498 F.2d 1344, 1346 (1974)).

Courts principally rely on two tests to determine whether
to apply the step-transaction doctrine: the interdependence

test and the end result test.  *See, Kornfield v.*
*Commissioner*, 137 F.3d 1231, 1235 (10th Cir. 1998); *Brown v.*
*United States*, 782 F.2d 559, 563-64 (6th Cir. 1986); *Security*
*Indus. Ins. Co. v. United States*,  702 F.2d 1234, 1244 (5th
Cir. 1983); *McDonald's Rests. v. Commissioner*, 688 F.2d 520,
524-25 (7th Cir. 1982).  While the two tests have different
formulations, both tests have as their central purpose the
implementation of "the central purpose of the step
transaction doctrine; that is, to assure that tax
consequences turn on the substance of a transaction rather
than on its form."  *King*, 418 F.2d at 517.

### 1.   The End-Result Test

The end-result test applies when "a series of separate
transactions were prearranged parts of what was a single
transaction, cast from the outset to achieve the ultimate
result." *Greene v. United States*, 13 F.3d 577, 583 (2d Cir.
1994)(*citing Penrod v. Commissioner*, 88 T.C. 1415, 1429 (T.C.
1987).  "[p]urportedly separate transactions will be
amalgamated into a single transaction when it appears that
they were really component parts of a single transaction
intended from the outset to be taken for the purpose of
reaching the ultimate result." *Brown*, 782 F.2d at 564
(*quoting King*, 418 F.2d at 516).  While the taxpayer's intent
is relevant under the end-result test, it is not the intent
to avoid taxes; instead, it is whether the taxpayer intended
to achieve a particular end-result, legitimate or not,
through a series of interrelated steps.  *True*, 190 F.3d at
1175.  Thus, if a taxpayer structures a single transaction in

a certain way that involves multiple steps, "he cannot
request independent tax recognition of the individual steps
unless he shows that at the time he engaged in the individual
step, its result was the intended end result in and of
itself." *Id.* at 1175 fn. 9.

    In this case, both Thomas and Fox contend that the reason
they engaged in the transactions at issue was to "hedge"
against a catastrophic collapse in the real-estate market.
Thus, as they described it, Thomas and Fox essentially placed
a "bet" that they now contend amounted to a hedge.
Therefore, the long option, the short option, and the
promissory note are simply the "interrelated steps" through
which Thomas and Fox accomplish this "bet" or "hedge."  Under
the end results test, these interrelated steps of the
transaction should be collapsed into a unified whole and the
tax consequences determined accordingly.

    In addition, any attempt by Plaintiffs to argue that they
had a valid business purposes, such as the plaintiff in the
*Falconwood* case, in engaging in the transactions at issue
does not "immunize" these transactions from the step
transaction doctrine.  *See, Stobie Creek*, 82 Fed. Cl. at 701.
While the court in *Falconwood* held that the step transaction
doctrine did not apply to the series of transactions at
issue, it did so because the taxpayer had an independent
business purpose for the initial step, and then was bound by
regulation to follow the remaining steps that the Government
had sought to collapse.  *Falconwood*, 422 F.2d at 1351-52
("Upon completing a downstream merger for independent

1  business reasons, Falconwood therefore had little choice in

2  the face of quasi-legislative mandates but to file a final

3  consolidated tax return for the group that covered

4  Falconwood's operations for its entire taxable year.").

5  However, as in *Stobie Creek,* Plaintiffs "cannot align

6  themselves with the factual circumstances presented in

7  *Falconwood*" because they "were not bound by any legislative

8  or regulatory mandate to proceed along the tortuous steps

9  that resulted in the claimed basis enhancement." *Stobie*

10 *Creek*, 82 Fed. Cl. at 702.

11            **2.   The Interdependence Test**

12      "The interdependence formulation of the step transaction

13 doctrine requires an inquiry into whether the individual

14 transactions in the series would be "fruitless" without

15 completion of the series." *Id.* at 699 (*quoting Falconwood*,

16 422 F.3d at 1349).  Under this test, courts analyze whether

17 or not one part of the overall transaction would have

18 occurred without another part.  *Kornfield*, 137 F.3d at 1235;

19 *Security Indus. Ins.*, 702 F.2d at 1247.  If not, the

20 transaction is then integrated and the step transaction

21 applies.  *Id.*  Thus, under this test, courts "disregard the

22 tax effects of individual transactional steps if "it is

23 unlikely that any one step would have been undertaken except

24 in contemplation of the other integrating acts." *True*, 190

25 F.3d at 1175 (*citing Kuper v. Commissioner*, 533 F.2d 152, 156

26 (5th Cir. 1976)).

27      In this case, the components of the transactions at issue

28 were interdependent because each component was required to

accomplish the desired economic result, which was, as Plaintiffs describe it a "bet" or "hedge" against a collapse in the real estate market.  This is best demonstrated by the fact that the documents executed as part of the transactions created interlocking contractual obligations.  For example, the Certificate re: Consent and Authorization discusses a "Master Transaction."  The Master Transaction "would be effectuated through the execution and delivery by the Trust of the  following agreements: (a) Master Agreement to be entered into by . . . the Trust and [AIG] . . .; (b) Note . . ., to be entered into by and between the Trust and [AIG]. . .; (c) Pledge Agreement by and between Trust and [AIG]; (d) Option and Equity Derivative Account Agreement by and between Trust and [AIG], and (e) Confirmation Letter Agreements re: share option transaction I and re: share option transaction II to Trust from [AIG]."  Moreover, the Master Agreement specifies that all transactions and confirmations constitute a single agreement.

The creation of these interlocking obligations with respect to the long option, the short option, and the note accomplished the goal of creating the "bet" sought by Thomas and Fox.  Neither the long or short option independently could have created the required "bet."  For example, Thomas and Fox would have only benefitted from an independent purchase of the long option if prices of the stocks in the REIT basket increased, which is the opposite of what they were trying to accomplish in "hedging" against a drastic downturn in the real estate market.  In addition, an

1  independent purchase of the short option would have exposed
2  Thomas and Fox to unlimited losses if the price of the stocks
3  in the REIT basket increased.  Thus, the purchase of the long
4  option, the short option, and the AIG note were required to
5  accomplish the desired "hedge."  Therefore, the transactions
6  making up the steps of the "hedge" strategy pursued by the
7  Plaintiffs "are interdependent and have no independent
8  functional justification outside of the series." *Stobie*
9  *Creek,* 82 Fed. Cl. at 700.  "Under the interdependence test,
10 the individual steps must be disregarded and collapsed into a
11 single transaction."  *Id.*

12     The Court finds that, under either the interdependence
13 test or the end result test, the step transaction doctrine
14 applies to Plaintiffs' transactions.  *Id.*  Accordingly, the
15 tax consequences should be determined on the substance of the
16 transactions at issue, and not on the form used by
17 Plaintiffs.  *Id.*

18

19     **C.   Application of the Substance Over Form Doctrine**
20          **Yields a Cost-Basis of $1.5 Million for Thomas and**
21          **$675,000 for Fox.**

22     In 1945, the Supreme Court stated: "The incident of
23 taxation depends on substance rather than form of the
24 transaction."  *Commissioner v. Court Holding Co.,* 324 U.S.
25 331, 334 (1945); *see, also, True v. United States*, 190 F.3d
26 at 1174 (10th Cir. 1999); *Allen v. Commissioner*, 925 F.2d 348,
27 352 (9th Cir. 1991).  In applying this principle, a court
28 "must look beyond the taxpayers' characterization of

isolated, individual transaction steps, and also review the substance of each series of transactions in its entirety." *True*, 190 F.3d at 1174.  Thus, taxpayers may not characterize a transaction solely based on the labels they have used, because such an approach "would completely thwart the Congressional policy to tax transactional realities rather than verbal labels." *Crenshaw v. United States*, 450 F.2d 472, 477-78 (5th Cir. 1971).  Therefore, it is the "true nature" of the transaction, not its "mere formalisms" that control.  *Court Holding*, 324 U.S. at 334; *see, also, Allen*, 925 F.3d at 352; *True*, 190 F.3d at 1174.

The countervailing consideration to application of the substance over form doctrine is the principle that taxpayers may generally structure their transactions as they wish. *Brown v. United States*, 329 F.3d 664, 671 (9th Cir. 2003). Thus, courts do not invalidate claimed tax benefits if the form of the transaction yields tax benefits which are consistent with Congressional intent as to the particular Internal Revenue Code provisions at issue.  *Id.* at 672. Therefore, courts must make a fact-specific inquiry to determine if the facts fall within the intended scope of the applicable statute.  *Stewart v. Commissioner*, 714 F.2d 977, 988 (9th Cir. 1983).

In this case, Thomas and Fox entered into the transactions at issue, which they described as "bets" or "hedges" against a collapse in the real estate market. Thomas contends that he "paid approximately $1,500,000 to take a chance that he could receive up to $38,400,000."

1   According to Thomas, "[t]he $1.5 million is, in effect, the
2   TDP transaction cost, the cost of inducing Banque AIG to make
3   a bet on real estate values.  Similarly, Fox contends he
4   "paid approximately $675,000 to take a chance that he could
5   receive up to $17,242,574."  According to Fox, "[t]he
6   $675,000 is, in effect, the Fox transaction cost, the cost of
7   inducing Banque AIG to make a bet on real estate values."

8       Once these initial payments of $1.5 million and $675,000
9   were made, Thomas and Fox had no downside exposure from their
10  "bets," and only an extremely remote possibility of receiving
11  a return.  These contractually interlocking transactions were
12  carefully structured so that the amount payable under the
13  short option would never exceed the amounts to be received
14  from the long option and the AIG note.  The assets – the long
15  option and the note – were pledged to AIG to secure the
16  liability created by the short option.

17      For purposes of the application of the form over
18  substance doctrine, the substance of the transaction is
19  clearly a net payment of $1.5 million by Thomas and $675,000
20  by Fox for a possible payout with no downside exposure.
21  Therefore, Thomas's true economic cost is $1.5 million, not
22  $101.5 million.  Similarly, Fox's true economic cost is
23  $675,000, not $45,675,000.

24      Because the basis of property is its cost per I.R.C. §
25  1012, and because Thomas's economic cost for the entire
26  transaction was $1.5 million, his basis was $1.5 million.
27  Thomas's partnerships succeeded to that basis.  Similarly,
28  because Fox's economic cost for the entire transaction was

$675,000, his basis was $675,000.  HFI succeeded to that basis, while MP-MI and TMI succeeded to their proportional share of that basis.  The partnerships' characterization of the contribution at more than sixty times what Thomas and Fox actually paid for their unified position is plainly inconsistent with the fundamental principle that basis equals cost as expressed by Congress in I.R.C. § 1012.  Accordingly, under the substance over form doctrine, the tax consequences should be determined on the substance of the transactions at issue, and not on the form used by Plaintiffs.

> **D.    Even if the Transactions At Issue Have Economic Substance and the Step-Transaction and Form Over Substance Doctrines Do Not Apply, the Obligation Created by the Short Option is a Liability for Purposes of I.R.C. § 752.**

When a partner contributes property to a partnership, the partnership succeeds to the contributing partner's basis in the property under I.R.C. § 723.  In addition, the contributing partner increases his basis in the partnership by his cost basis in the property under I.R.C. § 722.

On the other hand, when a partnership assumes a liability of a partner, the partner's basis in his partnership interest is: (1) decreased by the amount of the liability; and (2) increased by the partner's share of the partnership liability resulting from the assumption of the liability.  I.R.C. §§ 722, 733(1), and 752(a) and (b).  Once the liability is satisfied, the partner's basis in his partnership interest is

decreased by the amount of the liability.  I.R.C. §§ 733(1) and 752(b).

In this case, Plaintiffs argue that the short option was not a liability for purposes of Section 752.  Therefore, for example, Thomas argues that the $101.5 million increase in basis that he received when he contributed the long option and the AIG note should not be reduced to account for the offsetting $100 million short option.  However, as explained above, when the liability is satisfied, Thomas's basis should be reduced by $100 million pursuant to Section 752. Therefore, the increase in Thomas's basis would be merely $1.5 million, or the equivalent of Thomas's net payment for the transaction.  Thus, the characterization of the partnership's short option as a liability for purposes of Section 752 is consistent with the cost basis – and the economic reality – of Thomas's contribution.  *See*, I.R.C. § 1012.

The above interpretation of Section 752 is consistent with Revenue Ruling 88-77, where the I.R.S. determined that when an obligation creates or increases the basis of the obligor's assets, the obligation is a "liability" for the purposes of Section 752.  In Revenue Ruling 88-77, the I.R.S. defined liability for purposes of Section 752 to "include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)."

1      In this case, the short option, the long option, and the
2  AIG note were contractually interlocked, and the acquisition
3  of the obligation (the short option) clearly created basis
4  (via the long option and the note) and should be recognized
5  as a liability for purposes of Section 752.  In fact, the
6  long option and the AIG note were purchased with the proceeds
7  of the sale of the short option.

8      The above interpretation of Revenue Ruling 88-77 is
9  consistent with the Fifth Circuit's interpretation in *Korman*
10 *& Associates, Inc., v. United States*, 527 F.3d 443 (5th Cir.
11 2008), and the Court of Federal Claim's recent interpretation
12 in *Marriott International Resorts, L.P., v. United States*, 83
13 Fed. Cl. 291 (2008).[9]  At the time of the transactions at
14 issue in this case and prior to the Fifth Circuit's decision
15 in *Korman*, the *Helmer* line of cases found that certain
16 liabilities assumed by partnerships should not be recognized
17 for basis purposes because they were too indefinable or
18 "contingent."  *See, Helmer v. Commissioner*, T.C. Memo. 1975-
19 160 (1975); *see, also, Long v. Commissioner*, 71 T.C. 1
20 (1978), *and La Rue v. Commissioner*, 90 T.C. 465 (1988).

21     For example, in *Helmer*, a corporation held a purchase
22 option on real estate owned by a partnership, and made
23 periodic payments to maintain the option.  T.C. Memo. 1975-
24
25      [9]   The recent Court of Federal Claims case of *Marriott
   International Resorts*, relied on Revenue Ruling 88-77 to
   determine that the obligation created by a short sale was a
26 liability for purposes of I.R.C. § 752.  *Marriott
   International Resorts, L.P. v. United States*, 83 Fed. Cl. 291
27 (2008) (finding that, in light of the promulgation of Revenue
   Ruling 88-77, symmetrical treatment that "would call for
28 recognition of the corresponding obligation to replace the
   borrowed securities" was required under Section 752).

160 (1975).  Because the partnership was obligated to apply
the option payments to the purchase price if the corporation
exercised its option, the partners argued that its receipt of
these payments created a partnership liability that increased
their basis in the partnership.  *Id.*  However, the Tax Court
found that the payments "created no liability on the part of
the partnership to repay the funds paid nor to perform any
services in the future."[10]  *Id.*

However, in *Korman*, the Fifth Circuit addressed the
question whether the assumption of a liability from a short
sale of Treasury notes is a liability under Section 752, and
determined that it was a Section 752 liability because the
assumption was accompanied by the contribution of the
proceeds from the short sale.  In *Korman,* the taxpayer
borrowed $100 million in Treasury bills and sold them for
$102.5 million.  The taxpayer then contributed the $102.5
million to a partnership, and the partnership assumed the
liability for covering the short sale.  The taxpayer then
conveyed the partnership interest to another partnership,
which sold the interest for $1.8 million.  The taxpayer
claimed a loss of $100 million, and ignored the liability

---

[10]  That the option holder in *Helmer* was able to exercise
his option or not is a key distinction between *Helmer*, and
its progeny, and this case where the funds received from the
sale of the short option are used to purchase the long option
and the AIG note, and the proceeds of which are pledged to
secure the liability created by the short option.  *Helmer* and
its progeny also are distinguishable from this case because
they did not involve the assumption of a payment obligation
by a partnership from a partner.

created by the obligation to cover the short sale because it
was "contingent."[11]

The Fifth Circuit noted that the taxpayer acknowledged
"only suffer[ing] a $200,000 economic loss" but "claim[ing] a
$102.6 [m]illion tax loss on its return." *Id.* at 456.  The
Fifth Circuit found the taxpayer was making a "premeditated
attempt to transform this wash transaction (for economic
purposes) into a windfall (for tax purposes)" that was
"reminiscent of an alchemist's attempt to transmute lead into
gold." *Id.*

In this case, as in *Kornman*, Plaintiffs are seeking to
"treat[] [their] contingent assets and . . . contingent
liabilities asymmetrically." *Id.* at 460 (internal citation
omitted).  Moreover, the proceeds from the initial short sale
and the subsequent covering transaction in this case are
"inextricably intertwined." *Id.* at 460-61.  Therefore, to
apply the *Helmer* line of cases to this case would, as the
*Korman* court found, "fl[y] in the face of reality" and result
in an "unwarranted aberration." *Id.* at 461.

---

[11]   However, as the Fifth Circuit found, "[t]he Internal
Revenue Code deals with dollars, and the basis adjustment
provisions of section 752 presume that the value of the
liability is ascertainable." *Korman,* 527 F.3d at 452.

1    **E.    Even if the Short Option is Not an I.R.C. § 752**

2         **Liability, the Obligation Created by the Short**

3         **Option Must Still be Taken into Account under**

4         **Treasury Regulation § 1.752-6.**

5         Section 1.752-6 of the Treasury Regulations applies to a

6    partnership's assumption of liability occurring after October

7    18, 1999, and before June 24, 2003, if I.R.C. § 752(a) and

8    (b) do not apply to that liability.[12]  26 C.F.R. 1.752-6.  On

9    June 24, 2003, the Treasury Department proposed regulations,

10   including temporary Treasury Regulation § 1.752-6, that would

11   define "liability" in the partnership context under I.R.C. §

12   752, and which relied on the interpretation of "liability"

13   found in I.R.C. § 358(h)(3)[13] and Revenue Ruling 88-77.  *See,*

14   *Assumption of Partner Liabilities*, 68 Fed.Reg. 37,434 (June

15   24, 2003) (Prop. Treas. Reg. §§ 1.752-0 to -7).  These

16   temporary regulations became final on May 26, 2005, and the

17   Treasury Department specified that Treasury Regulation §

18   1.752-6 would apply retroactively.  *See,* 70 Fed.Reg. 30,334,

19   30,335 (May 26, 2005). Treasury Regulation § 1.752-6 was

20   adopted by Congressional directive pursuant to Section 309 of

21   the Community Renewal Tax Relief Act of 2000 ("2000 Act"),

22   which added Section 358(h) to the I.R.C., and which defines

23

24        [12]   Section 1.752-7 applies to assumptions of liability
     occurring after June 24, 2003, and taxpayers could elect to
25   apply it to assumptions of liability occurring between
     October 18, 1999, and June 24, 2003.  Treas. Reg. §
     1.752-7(k).
26

27        [13]   Section 358(h)(3), which defines "liability" in the
     context of determining basis on corporate transactions as
28   including "any fixed or contingent obligation to make
     payment."

"liability" as including contingent obligations for purposes of certain corporate stock exchanges.  Section 309(c)(1) of the 2000 Act required the Secretary of the Treasury to adopt comparable rules for transactions involving partnerships, and expressly authorized retroactivity of those rules by stating that the Treasury Regulations adopted under Section 309(c) "shall apply to assumption of liabilities after October 18, 1999, or such later date as may be prescribed in such rules."

If Treasury Regulation § 1.752-6 is applied retroactively in this case, the short options at issue would constitute liabilities for purposes of I.R.C. § 752, and, thus, would require a reduction in the partnership basis claimed by Plaintiffs.

Plaintiffs argue that, as the court in *Stobie Creek* recently found, the requirement under Section 1.752-6 that a partner's basis in a partnership interest must be reduced by the value of the contingent liabilities assumed by the partnership is "contrary to the then existing policy to exclude contingent liabilities from the computation of partnership basis." *Stobie Creek Investments, LLC v. United States*, 82 Fed. Cl. 636, 668 (2008) (citing *Helmer*, 34 T.C.M. (CCH) 727 (1975)).  Both Plaintiffs and the court in *Stobie Creek* base the conclusion that Section 1.752-6 represented a change from previous policy on the Treasury Department's statement that "[t]he definition of a liability contained in these proposed regulations [including Section 1.752-6] does not follow *Helmer*." *Stobie Creek,* 82 Fed. Cl. At 668 (citing 68 Fed.Reg. at 37,436).

1    However, other courts have found that Treasury Regulation
2    § 1.752-6 does apply retroactively.  For example, in *Cemco*
3    the United States Court of Appeals for the Seventh Circuit
4    observed that Treasury Regulation § 1.752-6 was "explicit" in
5    stating that it applied retroactively to assumptions of
6    liabilities occurring before its enactment.  *Cemco Investors,*
7    *LLC v. U.S.*, 515 F.3d 749, 752 (7th Cir. 2008).  The *Cemco*
8    court relied on I.R.C. § 7805(b)(6) which specifically allows
9    retroactivity.[14]  *Cemco*, 515 F.3d at 752.  The *Cemco* court
10   found that the effect of Treasury Regulation § 1.752-6 was to
11   "instantiate the pre-existing norm that transactions with no
12   economic substance don't reduce people's taxes."  *Cemco*, 515
13   F.3d at 752.

14   This Court agrees with the *Cemco* court that Treasury
15   Regulation § 1.752-6 should be applied retroactively.  The
16   Court finds that the rationale of the First Circuit in *Stobie*
17   *Creek* and Plaintiffs with respect to Treasury Regulation §
18   1.752-6 "misrepresents the state of prior law" by
19   interpreting the statement that "[t]he definition of a
20   liability contained in these proposed regulations does not
21   follow *Helmer v. Commissioner*" as an indication that *Helmer*
22   represented the prevailing prior law.  Burke, Karen C. and
23   McCough, Gayson, M.P., *Cobra Strikes Back:  Anatomy of a Tax*
24   *Shelter* (June 19, 2008), at 33 and 39 n. 121.  In addition,
25   the Treasury Department also stated that "following the
26   principles set forth in § 1.752-1T(g) and Rev. Rul. 88-77,

27
     ---
28   [14]   Retroactivity is also permitted to prevent abuse
     pursuant to I.R.C. § 7805(b)(3).

the proposed regulations provide that an obligation is a liability if and to the extent that incurring the obligation: (A) Creates or increases the basis of any of the obligor's assets (including cash)."  68 Fed. Reg. 37434, 37437 (2003).

Recognizing that "[t]here is no statutory or regulatory definition of liabilities for purposes of section 752" (68 Fed. Reg. 37434, 37435 (2003)),  the Treasury Department relied upon Revenue Ruling 88-77 and *Salina Partnership v. Commissioner*, T.C. Memo 2000-352 (T.C. 2000), and concluded that "[c]ase law and revenue rulings, however have established that, as under section 357(c)(3), the terms liabilities for this purpose does not include liabilities the payment of which would give rise to a deduction, unless the incurrence of the liability resulted in the creation of, or increase in, the basis of property."  68 Fed. Reg. 37334, 37435 (2003).  Thus, the Treasury Department found that "[t]he question of what constitutes a liability for purposes of section 752 was addressed in Revenue Ruling 88-77," and that the definition of liability in Revenue Ruling 88-77 was consistent with the Internal Revenue's position in Revenue Ruling 95-26.  *Id.* at 37436.  Therefore, the Treasury Department simply applied the pre-existing rule contained in Revenue Ruling 88-77 to address the possibility of abuse caused by contingent liabilities not being recognized under I.R.C. § 752.[15]

---

[15]   Treasury Regulation § 1.752-6 also incorporates the definition of liability contained in I.R.C. § 358(h)(3), which defines "liability" to include contingent liabilities.

1      Moreover, Notice 2000-44 placed Plaintiffs on notice that
2  the transactions it described would be scrutinized and
3  penalized.  Because Notice 2000-44 was issued in August 2000,
4  and notified taxpayers that the contribution of paired long
5  and short options to partnerships in order to artificially
6  increase outside basis were abusive, and would not be
7  allowed, the Secretary's exclusion of these transactions from
8  the exceptions in Treas. Reg. § 1.752-6(b) should not have
9  been a surprise to sophisticated taxpayers such as Thomas and
10 Fox, and their advisor, Arthur Andersen tax partner
11 Griffiths.  Moreover, while Plaintiffs argue that Notice
12 2000-44 did not give them notice because the transactions at
13 issue are not identical to those described in Notice 2000-44,
14 Plaintiffs conveniently ignore the "substantially similar"
15 language contained in the Notice.  Accordingly, the Court
16 finds that even if the short options at issue in this case
17 are not liabilities under I.R.C. § 752, the obligations
18 created by the short options still must be taken into account
19 under Treasury Regulation § 1.752-6.

20

21      **F.   The Accuracy-Related Penalties on the Ground of**
22           **Negligence or Disregarding the Rules or Regulations**
23           **is Appropriate Under I.R.C. § 6662.**

24      Section 6662 of the Internal Revenue Code governs
25 accuracy-related penalties.  The purpose of penalties is "to
26 deter taxpayers from playing the 'audit lottery,' that is,
27 taking undisclosed questionable reporting positions and
28 gambling that they [will] not be audited.  *Caulfield v.*

*Commissioner*, 33 F.3d 991, 994 (8th Cir. 1994).  As
Plaintiffs have argued, Thomas and Fox have not yet used any
of the tax benefits associated with the transactions at issue
in this case.  Because this case is a partnership-level
proceeding, the Court must determine "the applicability of
any penalty . . . which relates to an adjustment to a
partnership item."  I.R.C. § 6221.  However, the actual
computation of the penalty in not done at the partnership
level.

One of the accuracy-related penalties provided for in
Section 6662 of the Internal Revenue Code is for negligence
or disregard of rules or regulations.  I.R.C. § 6662(a) and
(b)(1).  The Code defines negligence as "any failure to make
a reasonable attempt to comply with the provisions" of the
Code.  I.R.C. § 6662(c).  This is an objective standard
requiring that the taxpayer exercise "due care."  *Hansen v.
Commissioner*, 471 F.3d 1021, 1028 (9th Cir. 2006) (*citing
Collins v. Commissioner*, 857 F.2d 1383, 1386 (9th Cir.
1988)).  Due care exists where the taxpayer "acted as a
reasonable and prudent person would act under similar
circumstances."  *Id.*  Under the Treasury Regulations,
negligence is "strongly indicated" where "a taxpayer fails to
make a reasonable attempt to ascertain the correctness of a
deduction, credit, or exclusion on a return which would seem
to a reasonable and prudent person to be 'too good to be
true' under the circumstances."  Treas. Reg. §
1.6662-3(b)(1)(ii) (2002); *see also Hansen*, 471 F.3d at 1029.
In the Ninth Circuit, negligence is determined by an analysis

1  of "both the underlying investment and the taxpayer's

2  position taken on the tax return."  *Hansen*, 471 F.3d at 1029;

3  *see also Neonatology Associates, P.A. v. Commissioner*, 299

4  F.3d 221, 234 (3d Cir. 2002) (finding that a taxpayer

5  "proceeds at his own peril" when "presented with what would

6  appear to be a fabulous opportunity to avoid tax

7  obligations."); *Pasternak v. Commissioner*, 990 F.2d 893, 902

8  (6th Cir. 1993) (upholding negligence penalty where the "Tax

9  Court found that petitioners were aware that they were buying

10  a program primarily of 'window dressings' for tax benefits

11  and either negligently or intentionally disregarded the

12  law.").

13      In this case, the Court finds that the facts support the

14  imposition of an accuracy-based penalty on the grounds of

15  negligence or disregard of the rules and regulations.

16  Specifically, the transactions were entered into over one

17  year after the IRS issued IRS Notice 2000-44 entitled "Tax

18  avoidance using artificially high basis," which alerted

19  taxpayers and their representatives that purported losses

20  arising from certain transactions designed to create

21  artificially high bases in partnership interests would be

22  disallowed.  In addition, the partnerships failed to

23  demonstrate any attempt to determine whether the transactions

24  would potentially be covered by Revenue Ruling 88-77.

25  Moreover, the partnerships failed to demonstrate that they

26  attempted to determine whether the transactions had any

27  economic substance.  Furthermore, the partnerships failed to

28  demonstrate that they sought and received disinterested and

objective tax advice because the tax advice that they did

receive came from Arthur Anderson, which also arranged the

transactions.  Based on these facts, the Court concludes that

any objective view of the transactions results in the

conclusion that they had no non-tax economic benefit.

In addition, the partnership returns reported the

valuation of the transaction at sixty-seven times their

proper value under either I.R.C. § 752 or the substance over

form or step-transaction analysis.  In that regard, the

Thomas partnerships reported an increase in its capital

account of $101,500,000, which is sixty-seven times the

actual economic outlay of $1.5 million that Thomas paid for

the transaction.  Any reasonable and prudent taxpayer would

consider the transaction "too good to be true."  Treas. Reg.

1.6662-3(b)(1)(ii) (2002).  Therefore, the Court finds that

the partnerships were negligent and disregarded the rules and

regulations for purposes of I.R.C. § 6662.  Id.

The reasonable cause and good faith defense is a fact and

circumstance test that focuses on the taxpayer's affirmative

actions to determine its correct tax liability: "[g]enerally,

the most important factor is the extent of the taxpayer's

effort to assess the taxpayer's proper tax liability."

Treas. Reg. § 1.6662-4(b).  The taxpayer's "experience,

knowledge, and education" may be taken into account.  *Id.*

Reliance on a tax advisor "does not necessarily demonstrate

reasonable cause and good faith."  *Id.*

In this case, the partnerships did not have reasonable

cause to disregard the liabilities created by the short

1  options in valuing the Arthur Andersen call option spreads

2  contributed to the partnerships.  The transactions were

3  entered into over one year after the IRS issued IRS Notice

4  2000-44 entitled "Tax avoidance using artificially high

5  basis."  This notice alerted taxpayers and their

6  representatives that purported losses arising from certain

7  transactions designed to create artificially high basis in

8  partnership interests would be disallowed.  In addition, the

9  partnerships have failed to provide evidence that they

10  diligently attempted to properly assess their proper tax

11  reporting.  The partnerships also have failed to demonstrate

12  any attempt to determine whether the transactions would

13  potentially be covered by Revenue Ruling 88-77.  Furthermore,

14  the partnerships have failed to demonstrate that they

15  attempted to determine whether the transactions had any

16  economic substance.  Finally, the partnerships have failed to

17  demonstrate that they sought and received disinterested and

18  objective tax advice because the tax advice that they did

19  receive came from Arthur Andersen, which also arranged the

20  transactions resulting in the increased basis that is at

21  issue in this case.  Therefore, the partnerships  have failed

22  to demonstrate that they acted in good faith as required by

23  the reasonable cause exception of I.R.C. § 6664(c)(1).

24

25  **Conclusions of Law**

26  1.  The Court has original jurisdiction over the federal

27  claims asserted in this action pursuant to Section 6226 of

28  the Internal Revenue Code.  The Court's jurisdiction extends

1   to all items of the partnership for the period at issue.

2   I.R.C. § 6226(f).  Contributions to partnerships and

3   distributions from partnerships are partnership items.

4   Treas. Reg. § 301.6231(a)(3)-1(a)(4)(I) and (ii).  The

5   characterization of offsetting options when contributed to

6   partnerships is a partnership item.  *See, Jade Trading, LLC*

7   *v. United States*, 80 Fed. Cl. 11, 41-43 (Fed. Cl. 2007);

8   *Nussdorf v. Comm'r*, 129 T.C. 30, 43-44 and n. 16 (2007).[16]

9         2.  Venue is proper in the United States District Court

10   for the Central District of California under 28 U.S.C.

11   § 1391(b) because the alleged acts complained of occurred and

12   are occurring in this district.

13         3.  In applying the economic substance analysis to the

14   transactions at issue in this case, the Court concludes that

15   the transactions at issue are economic shams for tax

16   purposes.

17         4.  Application of the step-transaction doctrine,

18   through either the end result test or interdependence test,

19   yields a cost basis of $1.5 million for Thomas and $675,000

20   for Fox.

21         5.  Application of the substance over form doctrine

22   yields a cost basis of $1.5 million for Thomas and $675,000

23   for Fox.

24         6.  The obligations created by the short options in the

25   transactions at issue are liabilities for purposes of I.R.C.

26   § 752.

27

28

---

[16]  The parties do not dispute the facts requisite to
federal jurisdiction.

1     7.   The obligations created by the short options in the

2  transactions at issue are liabilities for purposes of

3  Treasury Regulation § 1.752-6.

4     8.   I.R.C. § 6221 requires that "the tax treatment of

5  any partnership item (and the applicability of any penalty,

6  addition to tax, or additional amount which relates to an

7  adjustment to a partnership item) shall be determined at the

8  partnership level."  I.R.C. § 6226(e) authorizes this Court

9  to conduct partnership-level proceedings and determine "the

10  applicability of any penalty, addition to tax, or additional

11  amount which relates to an adjustment to a partnership item,"

12  I.R.C. § 6226(f).  In this case, the Court concludes that the

13  partnerships were negligent for purposes of IRC § 6662, and,

14  therefore, accuracy-related  penalties are applicable in this

15  case.

16

17  Dated: December 11, 2009

18                          JOHN F. WALTER
                            UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28